UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANTONIO BRUNO,

             Plaintiff,

     v.                              22-CV-686-LJV
                                              ORDER
ANTHONY J. ANNUCCI, *et al.*,

             Defendants.

_____

The *pro se* plaintiff, Antonio Bruno, was a prisoner confined at the Attica

Correctional Facility ("Attica") when he filed this action.  He asserts claims under

42 U.S.C. § 1983 and alleges that during an eight-day lockdown at Attica in spring

2022, the defendants violated his rights to due process and to be free from cruel and

unusual punishment.  Docket Item 1.  He has paid the filing fee, *see* 28 U.S.C. § 1914,

and has moved for appointment of counsel, Docket Item 12.  Bruno also has requested

that his case be treated as a class action and that he be provided copies of various

court rules and procedures.  Docket Item 15.

Because the plaintiff is a prisoner, *see* 28 U.S.C. § 1915(h), the Court screens

the complaint under 28 U.S.C. § 1915A(a).  For the reasons that follow, several of

Bruno's claims may proceed, but several are dismissed under section 1915A, and

others will be dismissed under that same section unless he files an amended complaint

correcting the deficiencies addressed below.

## DISCUSSION

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines that the complaint (1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2).

Generally, the court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639; *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999))). But leave to amend pleadings may be denied when any amendment would be "futile." *Cuoco*, 222 F.3d at 112.

## I.    SCREENING THE COMPLAINT

In evaluating a complaint, the court accepts all factual allegations as true and draws all inferences in the plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Boykin v. Keycorp*, 521 F.3d 202, 216 (2d Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure, *see Wynder v. McMahon*, 360 F.3d 73, 76 (2d Cir. 2004).

Bruno has sued four supervisory officials in their individual capacities: Anthony J. Annucci, Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); "S. Beck," Superintendent of the Attica Medical Department; "Mr. White," Attica Deputy of Security; and "J. Wolcott," Attica Superintendent. Docket Item 1 at 1-2. He also has sued two groups of "John Doe" defendants in their individual capacities: investigators of DOCCS's Office of Special Investigation ("OSI")[1] who were present during the lockdown at Attica; and correction officers who were part of the Hostage Rescue Team called in during the lockdown. *Id.*

---

[1] Bruno names the OSI investigators as John Doe defendants, Docket Item 1 at 3, but the complaint also identifies four investigators: Ammerman, Davis, Olson, and Kennedy, *id.* at 4. This Court assumes that Bruno intends to sue those four OSI investigators, and the Clerk of the Court shall amend the caption accordingly.

This Court also assumes that Bruno intends to sue only those four named investigators. If that is incorrect and he intends to sue John Doe OSI investigators in addition to those four, Bruno may clarify that in an amended complaint and provide information that will assist in identifying them, such as their names; physical descriptions; and the date, time, and specific location within Attica of their alleged unconstitutional conduct.

at 3.  Bruno alleges violations of his rights under the Eighth and Fourteenth

Amendments.  A liberal reading of the complaint tells the following story.[2]

On or about April 29, 2022, all Attica inmates were placed in lockdown in their

cells.  *Id.*  They had no running water or power for eight days, *id.*, and they had no

access to "laundry or cleaning supplies," *id.* at 18-19.  On at least one day, Bruno was

not given anything to eat.  *Id.* at 18.  He also was not able to perform his physical

therapy "in the yard" during the lockdown.  *Id.* at 18-19.

As a result of the lockdown conditions, Bruno "suffered from dizziness,

dehydration, and disorientation due to heat exhaustion"; contracted "a severe rash from

the heat and plastic mattress"; and developed "bronchial irritation from fire 'wicks'

burning and smoking all day and night."  *Id.* at 4.  And he was not the only inmate to

experience medical issues during the lockdown.  *See id.*  But even though "[s]ick call

was on [h]igh [n]otice," the Attica "Medical Department failed to respond . . . to the cries[

and ]pleas for help from the inmates[,]" and "no medical provider[]s came to the Block."

*Id.*

At one point, Attica "called in" a "Hostage Rescue Team" (the "Hostage Team")

due to a "disturbance" in the facility.  *Id.* at 3.  Hostage Team members—who did not

wear their body cameras—physically assaulted and psychologically abused inmates

---

[2] Bruno has attached several documents to his complaint.  *See* Docket Item 1.
These documents are part of the pleading and therefore are considered in this
screening order.  *See Cooper v. Dennison*, 2011 WL 1118685, at *1 (W.D.N.Y. Mar. 24,
2011) (In ruling on a 12(b)(6) motion to dismiss, "[d]ocuments that are attached to the
complaint or incorporated in it by reference are deemed part of the pleading and may be
considered."); *see also Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d
Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it
as an exhibit or any statements or documents incorporated in it by reference.").

both within and outside their cells.  *Id.*  OSI investigators were present for the assaults and abuses but failed to stop them.  *Id.*

On or about May 4, 2022, Hostage Team members entered Bruno's cell to search for contraband.  *Id.* at 3-4.  Bruno, who suffers from PTSD, had a panic attack during the search.  *Id.* at 4.  He told the Hostage Team members that he was on medication for his PTSD and that he "urgent[ly]" needed mental health attention.  *Id.*

But instead of helping Bruno, the Hostage Team members "physically assault[ed]" him.  *Id.*  They "slammed [him] into the wall," threw him to the ground, and told him to "[s]hut the [f***] up or [they would] kill [him]."  *Id.* at 4, 6.  Four OSI investigators—Ammerman, Davis, Olson, and Kennedy—were present during the search.[3]  *Id.* at 4-5.  But they did not stop the search or the assault; instead, they "stood idly and watched the Hostage [] Team [members] abuse their power and authority."  *Id.*

The assault by the Hostage Team members caused Bruno "lasting injuries" and exacerbated his pre-existing back and knee injuries.[4]  *Id.* at 4, 6.  During the assault, the "weight of the on-rushing" Hostage Team members caused Bruno's knee to "hit[] the wall with significant force."  *Id.* at 6.  Adding insult to injury, Hostage Team members

---

[3] The complaint generally alleges that "OSI [o]fficer[s] were present while the searches [of the inmates' cells] were taking place."  Docket Item 1 at 6.  It also makes allegations specific to Ammerman, Davis, Olson, and Kennedy.  *See id.* at 4 ("OSI [o]fficer[]s were present; Dated:[ ]5/4/22[.]  Their names are Ammerman, Davis, Olson, and Kennedy.").  Bearing in mind that a *pro se* complaint is to be read liberally, *see McEachin*, 357 F.3d at 200, this Court construes the complaint as alleging that Ammerman, Davis, Olson, and Kennedy were the OSI investigators who were present during the search of Bruno's cell and the Hostage Team's assault of Bruno.  As noted above, if this interpretation is incorrect, Bruno may clarify his allegations in an amended complaint.

[4] Bruno has arthritis in his "bad knee," which contains "multiple screws."  Docket Item 1 at 4, 6.

also "took [Bruno's] knee brace" that he needs to wear "day and night to stop the constant pain" in his knee.  *Id.* at 4.

## II.   SECTION 1983 CLAIMS

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  It is not enough to assert that the defendant is a "link[] in the prison['s] chain of command."  *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).  Moreover, the theory of *respondeat superior* is not available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  Instead, "[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d at 618.

### A.   Excessive Force Claim

"[T]he core judicial inquiry [for an excessive force claim] is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

6

sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citing *Whitley v.*

*Albers*, 475 U.S. 312 (1986)).  This inquiry includes both subjective and objective

components.  *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994).

> The objective component considers the "seriousness of the injury."  *Id.*
>
> [T]he extent of injury suffered by an inmate is one factor that may suggest
> "whether the use of force could plausibly have been thought necessary" in
> a particular situation, "or instead evinced such wantonness with respect to
> the unjustified infliction of harm as is tantamount to a knowing willingness
> that it occur."

*Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).  "The absence of serious

injury is . . . relevant to the Eighth Amendment inquiry[] but does not end it."  *Id.*  In

deciding whether force was applied to maintain discipline or simply to cause harm, a

court also looks at the subjective component: whether the defendant had a "wanton"

state of mind while engaging in the use of force.

> In determining whether the use of force was wanton or unnecessary, it may
> also be proper to evaluate the need for application of force, the relationship
> between that need and the amount of force used, the threat reasonably
> perceived by the responsible officials, and any efforts made to temper the
> severity of a forceful response.

*Id.* at 7 (citation and internal quotation marks omitted).

Thus, while the Eighth Amendment "excludes from constitutional recognition *de*

*minimis* uses of physical force," a plaintiff who was not seriously injured still may state a

cognizable Eighth Amendment claim if "the use of force is . . . of a sort 'repugnant to the

conscience of mankind.'"  *Id.* at 9-10 (quoting *Whitley*, 475 U.S. at 327).  A plaintiff need

only plead "sufficient facts . . . to support the plausible inference that the [d]efendants'

actions were motivated by a wanton and malicious desire to inflict pain rather than a

7

legitimate and good faith effort to restore or maintain order." *D'Attore v. Cucharella*, 2012 WL 5601406, at *6 (N.D.N.Y. Oct. 3, 2012).

Bruno alleges that Hostage Team members subjected him to excessive force and assaulted him in violation of his Eighth Amendment rights.  Docket Item 1 at 5-7. Those allegations raise a viable Eighth Amendment claim.  Bruno's excessive force claim therefore survives screening and may proceed to service against the John Doe Hostage Team members.

**B.    Inadequate Medial Care Claims**

A claim of inadequate medical care rises to the level of an Eighth Amendment violation only when a defendant, operating under color of law, was "deliberate[ly] indifferen[t]" to the plaintiff's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  This test has both an objective component and a subjective component.

A prisoner has a serious medical condition that satisfies the objective component where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."  *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). When evaluating whether a plaintiff has a serious medical need, courts consider factors such as "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Chance*, 143 F.3d at 702 (alterations, citation, and internal quotation marks omitted).  The subjective component of an inadequate-medical-care claim requires that the defendant had actual knowledge of the plaintiff's serious medical need

and was deliberately indifferent to that need.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).

"[N]ot every lapse in prison medical care will rise to the level of a constitutional violation."  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  For example, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  *Estelle*, 429 U.S. at 106.  And "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Id.*

Bruno asserts inadequate-medical-care claims related to three conditions: his knee pain, his PTSD, and the symptoms he experienced because of the lockdown.

### 1.    Knee Pain

Bruno alleges that after the Hostage Team exacerbated his pre-existing knee injury, he "needed medical attention" but did not receive it.[5]  Docket Item 1 at 9 ("[Bruno] was never seen by staff while seeking medical help.").  Instead, he was "left . . . to suffer in his condition while having to file multiple grievances seeking medical help."  *Id.*  He also alleges that Hostage Team members took the knee brace that he wears "day and night" to alleviate his knee pain.  *Id.* at 4.

Bruno's allegations that his knee causes him "constant pain" and that he suffered "lasting injuries" as a result of the alleged assault, *id.* at 4, satisfy the objective component of an inadequate-medical-care claim, *see, e.g.*, *Hemmings v. Gorczyk*, 134

---

[5] Bruno also makes a passing reference to a pre-existing back injury exacerbated by the alleged assault, Docket Item 1 at 4, but he does not elaborate on what that injury is, how it affects him, or what medical care he required for it.

F.3d 104, 106-09 (2d Cir. 1998) (torn Achilles tendon that caused swelling and pain

satisfied objective prong); *Williams v. Smith*, 2009 WL 2431948, at *8-10 (S.D.N.Y. Aug.

10, 2009) (severe back pain satisfied objective prong).

But Bruno does not allege that any of the defendants had a "culpable state of

mind and intended wantonly to inflict pain" with regard to the lack of treatment for his

knee condition, as is required to show a defendant's deliberate indifference. *See*

*Boatwright v. Canfield*, 680 F. Supp. 2d 468, 469 (W.D.N.Y. 2010) (citing *Wilson v.*

*Seiter*, 501 U.S. 294, 299 (1991)). For example, he does not allege that he told the

Hostage Team that he needed the brace "day and night" to alleviate "constant pain" or

that the Hostage Team members otherwise were aware of his knee injury. *See* Docket

Item 1.

Nor does Bruno allege that Beck, the Attica Medical Department Superintendent,

acted with deliberate indifference when Bruno was denied treatment for his knee after

the assault. In fact, rather than alleging that Beck was personally involved in any denial

of care, the complaint alleges only that Beck was "[g]rossly [n]egligent in [s]upervising

[her] subordinates"—presumably the Medical Department employees. *Id.* at 6. The

absence of allegations about Beck's personal involvement in—or even awareness of—

the lack of treatment for Bruno's knee pain dooms Bruno's inadequate-medical-care

claim against her based on that condition. *See Farmer*, 511 U.S. at 837; *see also*

*Tangreti*, 983 F.3d at 616.[6]

---

[6] What is more, the complaint alleges, at most, a delay in medical treatment for
Bruno's knee pain that lasted until the end of the eight-day lockdown. But a delay in
treatment typically does not "constitute deliberate indifference [unless] the condition
worsens and creates a substantial risk of injury." *Guerrero v. White-Evans*, 2009 WL
6315307, at *3 (S.D.N.Y. Sept. 17, 2009) (citation omitted). And the complaint does not

So even construed liberally, the complaint does not allege that any defendant was deliberately indifferent to Bruno's knee pain. Bruno therefore has failed to state a claim based on the lack of medical care for his knee and the confiscation of his knee brace, and that claim is subject to dismissal. But in light of his *pro se* status, Bruno may amend his complaint to add allegations showing the defendants' deliberate indifference to his knee pain.

###     2.     PTSD

Bruno also brings an inadequate-medical-care claim related to his inability to access mental health care during the lockdown. Docket Item 1 at 10. Bruno has PTSD, "has been on [m]ental [h]ealth medications," and has received "help from [m]ental [h]ealth specialists for years." *Id.* But his PTSD worsened during the lockdown. *Id.* During that time, he "asked for [m]ental [h]ealth help but was not able to see a [m]ental [h]ealth provider." *Id.*

Bruno's allegations that he had untreated PTSD satisfy the objective prong of an inadequate-medical-care claim. *See, e.g.*, *Dabney v. Sawyer*, 2013 WL 5494074, at *8 (N.D.N.Y. Sept. 30, 2013) (finding that prisoner diagnosed with several psychiatric disorders, including PTSD, alleged a sufficiently serious health condition). And Bruno has plausibly alleged that the Hostage Team members were deliberately indifferent to that medical need: he says that when he told them that he was on medication for PTSD and urgently needed to see a mental health provider, the Hostage Team members told him to "[s]hut the [f***] up" and threatened to kill him if he did not. Docket Item 1 at 4.

suggest that immediate treatment of Bruno's knee condition would have prevented his injury from worsening. *See* Docket Item 1.

But any claim against Beck related to the lack of treatment for Bruno's PTSD fails for the same reasons that his claim against her related to his knee fails: he has not alleged her personal involvement in—or even awareness of—the denial of his care.  *See Farmer*, 511 U.S. at 837; *see also Tangreti*, 983 F.3d at 616; *see generally* Docket Item 1.

Bruno's inadequate-medical-care claim against the Hostage Team members related to his mental healthcare therefore may proceed to service once those defendants are identified.  His claim against Beck related to treatment for his PTSD is subject to dismissal, but in light of his *pro se* status, Bruno may amend his complaint to include allegations of Beck's personal involvement.

### 3.   Medical Conditions Caused by Lockdown

Finally, Bruno alleges that during the lockdown, he "suffered from dizziness, dehydration, and disorientation due to heat exhaustion"; contracted "a severe rash from the heat and plastic mattress"; and developed "bronchial irritation from fire 'wicks' burning and smoking all day and night."  Docket Item 1 at 4.  Nevertheless, he says, the Attica Medical Department did not provide medical care while he was in lockdown.  *See id.*

Even assuming that those conditions satisfy the objective prong of an inadequate medical care claim, Bruno has not alleged that any of the defendants were aware of his lockdown-specific ailments.  *See* Docket Item 1.  He therefore has not alleged that the defendants were deliberately indifferent to his condition, and he thus has not raised a viable medical claim based on his dizziness, dehydration, disorientation, rash, and bronchial irritation during lockdown.  But in light of his *pro se* status, Bruno may amend

his complaint to allege that the defendants were deliberately indifferent to his medical needs regarding those conditions.

### C.     Failure-to-Intervene and Failure-to-Protect Claims

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer*, 511 U.S. at 832. The reasonableness inquiry has two prongs. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. Second, the officials must be shown to have demonstrated a deliberate indifference to the inmate's safety. *Id.* Deliberate indifference requires that "the official knows of and disregards an excessive risk to [the] inmate['s] health or safety." *Id.* at 837. Accordingly, "[a] law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers, and is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that excessive force is being used." *Porter v. Goord*, 467 F. App'x 21, 23 (2d Cir. 2012) (summary order) (citations and internal quotation marks omitted).

This Court interprets Bruno's allegations about the OSI investigators, Annucci, Wolcott, and White as asserting an Eighth Amendment violation based on those defendants' failure to intervene when Bruno was assaulted by the Hostage Team members.

### 1.     The OSI Investigators

Bruno alleges that the OSI investigators—Ammerman, Davis, Olson, and Kennedy—"were present" during the Hostage Team's search of his cell, that they "stood

idly and watched the Hostage [] Team abuse their power and authority," and that they "allowed [him] to be violently assaulted."  Docket Item 1 at 4-6.  In light of the serious nature of the alleged assault by the Hostage Team, Bruno has satisfied the first prong of a failure to intervene claim at this stage.  And liberally read, the complaint alleges that Ammerman, Davis, Olson, and Kennedy were deliberately indifferent to the serious risk faced by Bruno when they were present for—and thus aware of—the violent assault and failed to stop it.  *Id.*  Bruno's failure-to-intervene claim against Ammerman, Davis, Olson, and Kennedy therefore may proceed to service.

### 2.     The Supervisory Officials

Bruno also alleges that Annucci allowed Hostage Team members "to search Attica . . . without the proper body camera[]s to ensure the safety of the inmates," *id.* at 5, and that Wolcott and White were grossly negligent in supervising their subordinates— including the Hostage Team members who were allowed to "abuse their authority" during the lockdown, *id.* at 5-7 (underlining omitted).  Bruno's failure-to-protect claim against those defendants fails because the complaint does not plausibly allege that those defendants were personally involved in the deprivation of Bruno's rights or that they acted with deliberate indifference.

Without more, the allegation that Annucci allowed Hostage Team members to search Attica without wearing body cameras does not suggest that he was aware of an excessive risk of harm to Bruno's safety, let alone that he disregarded that risk.  *Farmer*, 511 U.S. at 837.  And Bruno's allegations that that Wolcott and White failed to supervise the Hostage Team members does not raise a viable claim because the theory of

*respondeat superior* is not available in a section 1983 action.  *See Hernandez*, 341 F.3d at 144-45.

Bruno's failure-to-protect claims against Annucci, Wolcott, and White therefore are subject to dismissal.  But in light of his *pro se* status, Bruno may amend his complaint to allege facts showing that those defendants were personally involved in the deprivation of his rights and acted with deliberate indifference.

### D.    Conditions-of-Confinement Claim

To state a claim for unconstitutional conditions of confinement, a plaintiff must allege "(1) that the deprivation alleged [was] 'objectively sufficiently serious' such that [he] was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.'"  *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer*, 511 U.S. at 834).  The Eighth Amendment "does not mandate comfortable prisons," *Davidson v. Conway*, 318 F.Supp.2d 60, 62 (W.D.N.Y. 2004) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), and "'[n]ormal' conditions of SHU confinement do not amount to an Eighth Amendment violation,"[7] *Hattley v. Goord*, 2006 WL 785269, at *6 (S.D.N.Y. Mar. 27, 2006) (citing *Shannon v. Selsky*, 2005 WL 578943, at *6 (S.D.N.Y. Mar. 10, 2005)).  But the Eighth Amendment "does [not] permit inhumane [conditions]."  *Farmer*, 511 U.S. at 832 ("The Amendment [] imposes duties on [prison] officials, who must provide humane conditions of

---

[7] The SHU—short for "special housing unit"—houses inmates "for disciplinary or protective purposes."  *See Malik v. Miller*, 679 F. Supp. 268, 269 (W.D.N.Y. 1988).

confinement[, such as] ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care . . . ").

Liberally read, Bruno's complaint asserts a conditions-of-confinement claim regarding the lockdown conditions.  It alleges that during the lockdown, the inmates—including Bruno—had "no water or power in their cells for eight days."  Docket Item 1 at 3.  In fact, the conditions were so awful that Bruno "suffered from dizziness, dehydration, and disorientation due to heat exhaustion," *id.* at 4, and on at least one day, Bruno did not get anything to eat, *id.* at 18.  At the screening stage, these allegations suggest that the lockdown conditions were objectively sufficiently serious to satisfy the first prong of a conditions of confinement claim.  *See Farmer*, 511 U.S. at 834.

But Bruno has not alleged that any defendant "possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain'" regarding the lockdown conditions—the second prong of a conditions-of-confinement claim.  *See Trammell*, 338 F.3d at 161.  For example, he has not specifically alleged who ordered the lockdown; who was responsible for bringing him—and failed to bring him—food; or whether prison officials were aware of the lack of water and power, or the extreme heat, in the cells.  *See* Docket Item 1.

Bruno therefore has not raised a viable conditions-of-confinement claim. Nevertheless, in light of his *pro se* status, Bruno may amend his complaint to add allegations establishing which defendants were personally involved in creating or continuing the allegedly inhumane lockdown conditions and that those defendants possessed a sufficiently culpable state of mind.

### E.    Due Process Claims

Finally, Bruno alleges that the defendants violated his rights to both substantive and procedural due process under the Fourteenth Amendment based on the conduct described above.  *Id.* at 8-9.  But those claims fail and are dismissed without leave to amend.

### 1.    Substantive Due Process

"[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners."  *Whitley*, 475 U.S. at 327 (holding that for an excessive-force claim, the due process clause of Fourteenth Amendment afforded a prisoner "no greater protection" than did the cruel and unusual punishment clause of the Eighth Amendment).  Because Bruno is a convicted prisoner, any protection that substantive due process affords him is "at best redundant of that provided by the Eighth Amendment."  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  Moreover, where, as here, "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

Bruno's substantive due process claim therefore is dismissed.  *See Fitzgerald v. Oakes*, 2020 WL 2839327, at *4 (W.D.N.Y. June 1, 2020) (finding that because the plaintiff's claims were "within the purview of the Eighth Amendment's prohibition on cruel and unusual punishment, . . . his substantive due process claims are subject to dismissal"); *Kaminski v. Oniyuke*, 2019 WL 1877075, at *4 (D. Conn. Apr. 26, 2019)

17

(holding that, on initial screening of the complaint, "if [the plaintiff's] substantive due process claim is based on the same action(s) that gave rise to his Eighth Amendment claim for deliberate indifference to medical needs, then his due process claim will be dismissed").

### 2.   Procedural Due Process

Bruno alleges that the defendants violated his right to procedural due process by denying him "adequate medical treatment" during the lockdown.  Docket Item 1 at 9.  He apparently suggests that this was a denial of his "liberty" without due process in violation of the Fourteenth Amendment.  *Id.*  But that claim is dismissed for the same reason that his substantive due process claim is dismissed: it "is more properly addressed under the Eighth Amendment because that amendment 'governs the way in which medical treatment is administered to prisoners.'"  *Hatzfeld v. Goord*, 2007 WL 700961, at *1 n.3 (N.D.N.Y. Feb. 28, 2007) (quoting *Pabon v. Wright*, 459 F.3d 241, 253 (2d Cir. 2006)).

### F.   John Doe Defendants/Valentin Order

With respect to the excessive-force and inadequate-medical-care claims asserted against the John Doe Hostage Team members, and pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), the New York State Attorney General's Office shall ascertain the full names of the John Doe Hostage Team members who searched Bruno's cell on or about May 4, 2022.  The Attorney General's Office shall do the same with respect to OSI Investigators Ammerman, Davis, Olson, and Kennedy with respect to the failure-to-intervene claim asserted against them.  The Attorney General's Office also shall provide an address where the John Doe Hostage Team members and

Ammerman, Davis, Olson, and Kennedy may be served.  The Attorney General's Office need not defend or indemnify these individuals at this juncture.  This order merely provides a means by which Bruno may name and properly serve the defendants as instructed by the Second Circuit in *Valentin*.

The Attorney General's Office shall produce the information specified above regarding the John Doe Hostage Team members and Ammerman, Davis, Olson, and Kennedy **within 35 days of the date of this order**.  The information shall be forwarded to the Court's *Pro se* Unit, United States District Court, 2120 Kenneth B. Keating Federal Building, 100 State Street, Rochester, New York 14614.  Once this information is provided, Bruno's complaint shall be deemed amended to reflect the names of the defendants in place of the John Doe Hostage Team members and the John Doe OSI investigators.  If Bruno does not file an amended complaint within 45 days of the date of this order consistent with the order below, summonses shall issue.

## III.   COUNSEL REQUEST

Bruno has asked this Court to appoint counsel for him.  Docket Item 12 at 1-2.  In deciding whether to appoint counsel, courts first assess the indigent plaintiff's likelihood of success on the merits of his claim.  *See Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986).  If the claim meets this threshold requirement, courts consider a number of other factors, including "the nature of the factual issues the claim presents[,] . . . the plaintiff's apparent ability to present the case[,] . . .  whether appointment of counsel would lead to a quicker and more just result by sharpening the issues and shaping examination[,] . . . [and the plaintiff's] efforts to obtain counsel."  *Id.*

This action was commenced only recently, and the defendants have not yet answered the allegations in the complaint. The only facts upon which this Court may base its decision as to whether this lawsuit is of substance are Bruno's bare allegations. At this stage, the Court therefore lacks sufficient information to consider the factors stated in *Hodge*, and Bruno's request for appointment of counsel is denied without prejudice as premature.

## IV.    CLASS CERTIFICATION

Bruno recently filed a letter requesting, in part,[8] that the Court "make this [i]nto a class action" because "more than one [i]ncarcerated [i]ndividual" has filed "a civil rights [l]aw[]suit" related to the Attica lockdown. Docket Item 15 at 2. The Court construes this request as a motion for class certification pursuant to Federal Rule of Civil Procedure 23(c). Bruno—a *pro se* litigant—cannot represent the rights of others, including other inmates. *See, e.g.*, *Rodriguez v. Eastman Kodak Co.*, 88 F. App'x 470, 471 (2d Cir. 2004) (noting that it is "well established that a *pro se* class representative cannot adequately the interests of other class members") (citation and internal quotation marks omitted). His motion for class certification therefore is denied.

---

[8] Bruno also requests a status report regarding his motion for the appointment of counsel, which is addressed herein, and copies of the Court's *Pro Se* Handbook, Local Rules of Civil Procedure, and several rules contained within the Federal Rules of Civil Procedure. Docket Item 15 at 1. The Clerk of the Court is directed to forward to Bruno copies of the Federal Bar Association's *Pro Se* Handbook and the Court's Local Rules of Civil Procedure. The Federal Rules of Civil Procedure should be available to Bruno in the prison law library.

**CONCLUSION**

For the reasons noted above, the following claims may proceed to service once the relevant defendants are identified and the Attorney General's office has provided an address at which they may be served: (1) the excessive-force claim against the John Doe Hostage Team members; (2) the inadequate-medical-care claim related to the denial of treatment for Bruno's PTSD against the John Doe Hostage Team members; and (3) the failure-to-intervene claim against OSI Investigators Ammerman, Davis, Olson, and Kennedy.  Bruno's substantive due process and procedural due process claims are dismissed without leave to amend under 28 U.S.C. § 1915A(b).

The following claims are subject to dismissal under that same section: (1) the inadequate-medical-care claim related to Bruno's knee pain; (2) the inadequate-medical-care claim related to the symptoms Bruno developed because of the lockdown; (3) all inadequate-medical-care claims against Beck; (4) the failure-to-protect claims against Annucci, White, and Wolcott; and (5) the conditions-of-confinement claim. Nevertheless, and in light of Bruno's *pro se* status, *see generally Cuoco*, 222 F.3d at 112, the Court grants him permission to amend those claims to include, if possible, specific facts showing that the defendants acted with deliberate indifference and were personally involved in the denial of Bruno's constitutional rights.  Those claims will be dismissed under 28 U.S.C. § 1915A(b) unless Bruno files an amended complaint **within 45 days of the date of this order** that corrects the deficiencies noted above and otherwise complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Bruno is advised that an amended complaint is intended to ***completely replace*** the prior complaint in the action and thus "renders [any prior complaint] of no legal

21

effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)*; see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Therefore, any amended complaint **must include all allegations against each of the defendants** so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

## ORDER

In light of the above, IT IS HEREBY

ORDERED that Bruno's motion for appointment of counsel, Docket Item 12, is denied without prejudice as premature; and it is further

ORDERED that Bruno's motion for class certification, Docket Item 15, is denied; and it is further

ORDERED that the Clerk of the Court shall forward to Bruno with this order the Federal Bar Association's *Pro Se* Handbook and this Court's Local Rules of Civil Procedure; and it is further

ORDERED that the Clerk of the Court shall amend the caption to add Ammerman, Davis, Olson, and Kennedy as defendants; and it is further

ORDERED that Bruno's due process claims are dismissed with prejudice under 28 U.S.C. § 1915A(b)(1); and it is further

ORDERED that Bruno may amend his complaint regarding his inadequate-medical-care, failure-to-protect, and conditions-of-confinement claims **within 45 days from the date of this order**; and it is further

ORDERED that the Clerk of the Court shall send to Bruno with this order a copy of the original complaint, a blank section 1983 complaint form, the instructions for

preparing an amended complaint, and the Notice Regarding Service of Summons and Complaint, with Attached Request for United States Marshal Service; and it is further

ORDERED that if Bruno does not file an amended complaint correcting the deficiencies noted above **within 45 days of the date of this order**, the following claims will be dismissed without further order of the Court: (1) the inadequate-medical-care claim related to Bruno's knee pain; (2) the inadequate-medical-care claim related to the symptoms Bruno developed because of the lockdown; (3) all inadequate-medical-care claims against Beck; (4) the failure-to-protect claims against Annucci, White, and Wolcott; and (5) the conditions-of-confinement claim; and the Clerk of the Court shall terminate defendants Annucci, Beck, White, and Wolcott as parties to this action; and it is further

ORDERED that the New York State Attorney General's Office shall provide the Court with the full names and addresses of the John Doe Hostage Team members and OSI Investigators Ammerman, Davis, Olson, and Kennedy—or a written statement of reasons why such identification is improper or impossible—**within 35 days of the date of this order**; and it is further

ORDERED that the Attorney General's Office's failure to comply with this order may result in sanctions under Rule 37 of the Federal Rules of Civil Procedure; and it is further

ORDERED that if Bruno does not file an amended complaint correcting the deficiencies noted above **within 45 days of the date of this order**, the Clerk of the Court shall issue the summonses for the John Doe Hostage Team members and OSI Investigators Ammerman, Davis, Olson, and Kennedy.  Bruno paid the filing fee and

therefore is responsible for service of the summons, the complaint, and this order on the defendants when they are identified. Because he is an inmate in a correctional facility who is proceeding *pro se*, Bruno may want to request service by the United States Marshals Service at a nominal cost, as is explained in the Notice Regarding Service of Summons and Complaint that the Clerk of the Court will send to him. Should Bruno choose to ask the Marshals Service to serve the defendants, he should use the Request for United States Marshals Service that the Clerk of the Court will send to him;[9] and it is further

ORDERED that the Clerk of the Court shall forward a copy of this order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office, at <Michael.Russo@ag.ny.gov>; and it is further

ORDERED that once served, the defendants shall answer the complaint or respond under 42 U.S.C. § 1997e(g); and it is further

ORDERED that Bruno shall notify the Court in writing if his address changes. The Court may dismiss the action if Bruno fails to do so.

---

[9] Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant will have 60 days to file and serve an answer or other responsive pleading, *see* Fed. R. Civ. P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the summons and complaint by mail pursuant to N.Y. C.P.L.R. § 312-a.

SO ORDERED.

Dated:      March 22, 2023
            Buffalo, New York


                                    /s/ Lawrence J. Vilardo
                                    LAWRENCE J. VILARDO
                                    UNITED STATES DISTRICT JUDGE